**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| CITY OF BOSTON<br><br>Plaintiff,<br><br>v.<br><br>SEAN DUFFY, in his official capacity as Secretary of the U.S. Department of Transportation; U.S. DEPARTMENT OF TRANSPORTATION; FEDERAL TRANSIT ADMINISTRATION; and MATTHEW CAHILL, in his official capacity as Acting Deputy Administrator of the Federal Transit Administration,<br><br>Defendants. | Case No. 26-14419 |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

In August 2022, the United States Department of Transportation ("DOT") awarded the City of Boston (the "City" or "Boston") a $20 million grant authorized by the Infrastructure Investment and Jobs Act ("IIJA"). The Federal Fiscal Year 2022 ("FFY22") Rebuilding American Infrastructure with Sustainability and Equity ("RAISE") award supported infrastructure improvements for three thoroughfares in Boston's Roxbury neighborhood: Melnea Cass Boulevard, Malcolm X Boulevard, and Warren Street (collectively, the "Roxbury Project"). The Roxbury Project is intended to complement other street infrastructure projects in the Roxbury neighborhood, which has suffered from decades of underinvestment.

The Roxbury Project explicitly satisfied the RAISE grant criteria established by Congress and incorporated into DOT's Notice of Funding Opportunity ("NOFO"), which described the goals of the program (the "RAISE Grant Program"). Alongside significant upgrades to the roads and

sidewalks, the Roxbury Project met the IIJA's requirements that RAISE-funded projects "improve[] environmental sustainability" and adopt "innovative technologies or techniques." 49 U.S.C. §§ 6702(d)(3), (4). The Roxbury Project included a small investment in electric vehicle ("EV") charging infrastructure (less than 1% of the grant), which the NOFO specifically identified as an asset in meeting the IIJA's criteria.

In the years following the award, the City worked collaboratively with DOT, the Federal Transit Authority ("FTA"), and community stakeholders to prepare for the Roxbury Project by taking steps to onboard as an FTA grant recipient, engaging with community members on the project's priorities, running a selection process for a design consultant, and collaborating with state and regional partners to incorporate the project into a broader neighborhood plan. While the City and FTA worked collaboratively during this period, they had not yet executed a grant agreement.

In September 2025, after three years of grant planning, DOT abruptly and without warning withdrew the City's award. In a brief letter, DOT stated that the agency's priorities "presently include: promoting traditional forms of energy and natural resources" and "ensuring that taxpayer dollars are used efficiently." DOT then claimed to have reviewed the City's grant in light of these priorities and determined that the grant was "inconsistent" with them "because of the project's inclusion of EV charging infrastructure." The letter did not explain how these new "priorities" complied with the statutory criteria for RAISE grants, nor did it provide a rationale for departing from the established grant methodology provided in the NOFO. The letter failed to acknowledge that the RAISE grant for the Roxbury Project was intended to support road infrastructure, with the overwhelming share of funds dedicated to street, sidewalk, and transit improvements. DOT also did not weigh or account for Boston's serious reliance interests created by the grant award. Rather,

the letter merely concluded that "[b]ecause your project no longer aligns with DOT priorities, the Department is withdrawing the selection of your project for a FY 2022 RAISE grant."

Defendants' actions to withdraw the grant are arbitrary and capricious, exceed statutory authority, and are contrary to law. To prevent irreparable injury to the City, this Court should declare that Defendants' actions violate the Administrative Procedure Act ("APA"), violate provisions of the United States Constitution, and are ultra vires agency actions. The City requests that this Court vacate Defendants' unlawful actions and permanently enjoin Defendants from, among other things, administering the City's RAISE grant for the Roxbury Project in a manner that contravenes the requirements of the IIJA.

**JURISDICTION AND VENUE**

1. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under federal law, including federal statutes and the APA, 5 U.S.C. §§ 551 *et seq*., and 5 U.S.C. §§ 702, 704.
2. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other appropriate relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, the APA, 5 U.S.C. §§ 705-06, the All Writs Act, 28 U.S.C. § 1651, and the Court's inherent equitable powers.
3. Venue is proper in the United States District of Massachusetts pursuant to 28 U.S.C. § 1391(e)(1) because Defendants are officers and agencies of the United States serving in their official capacities, no real property is at issue in this case, and the City is a municipal corporation located in the Commonwealth of Massachusetts, where the federal grant

withdrawal that is the subject of this suit occurred and where the resulting harm to the City has and will continue to occur unless enjoined.

## PARTIES

4. **Plaintiff**

   a. Plaintiff City of Boston is a municipal corporation organized and existing under the laws of the Commonwealth of Massachusetts.

5. **Defendants**

   a. Defendant Sean Duffy is the Secretary of the United States Department of Transportation and that agency's highest-ranking official. He is charged with the supervision and management of all decisions and actions of that agency, and is responsible for the actions and decisions challenged in this litigation. 49 U.S.C. § 102(b). He is sued in his official capacity.

   b. Defendant United States Department of Transportation ("DOT") is an agency and executive department of the United States government. 49 U.S.C. § 102(a). DOT has responsibility for implementing the federal grant program at issue in this action, including through the Federal Transit Administration. DOT is an "agency" within the meaning of the APA. 5 U.S.C. § 701(b)(1).

   c. Defendant Federal Transit Administration ("FTA") is an agency of the federal government within DOT. 49 U.S.C. § 107. FTA is an "agency" within the meaning of the APA. 5 U.S.C. § 701(b)(1).

   d. Defendant Matthew Cahill is the Acting Deputy Administrator of the Federal Transit Administration within the United States Department of Transportation. As the Acting Deputy Administrator, he is responsible for the operations of an agency

charged with supporting and expanding public transportation across the country. He is sued in his official capacity.

**ALLEGATIONS**

*Statutory Creation of the RAISE Grant Program*

6. On November 15, 2021, Congress passed the Infrastructure Investment and Jobs Act (Pub. L. 117-58, November 15, 2021) ("IIJA").
7. The IIJA included authorization and funding for National Infrastructure Investments, including the Local and Regional Project Assistance Program, which required the Secretary of Transportation to establish a program for "capital investments in surface transportation infrastructure." 49 U.S.C. § 6702(b)(1).
8. Congress instructed the Secretary of Transportation to consider, as the "primary selection criteria" for a grant funded under 49 U.S.C. § 6702, the extent to which a project:
   a. improves safety;
   b. improves environmental sustainability;
   c. improves the quality of life of rural areas or urbanized areas;
   d. increases economic competitiveness and opportunity, including increasing tourism opportunities;
   e. contributes to a state of good repair; and
   f. improves mobility and community connectivity.

   49 U.S.C. § 6702(d)(3).
9. Congress instructed that "additional selection criteria" should include analysis of whether "the project adopts innovative technologies or techniques." 49 U.S.C. § 6702(d)(4).

10. Congress mandated that DOT evaluate grant applications "through a methodology that is discernible and transparent to the public." 49 U.S.C. § 6702(d)(5)(A). The methodology was required to "be published by the Secretary as part of the notice of funding opportunity under the program." 49 U.S.C. § 6702(d)(5)(B).

11. Congress also required that a portion of the funding be awarded to "historically disadvantaged communities or areas of persistent poverty," as defined by DOT. 49 U.S.C. § 6702(f)(2).

*DOT's Notice of Funding Opportunity*

12. To implement the Local and Regional Project Assistance Program, consistent with these statutory requirements, DOT created the Rebuilding American Infrastructure with Sustainability and Equity ("RAISE") Grant Program.

13. The Notice of Funding Opportunity ("NOFO") process is governed by 2 C.F.R. §§ 200.202-204, regulations which require an agency seeking to issue an award to design a program "[w]ith clear goals and objectives" 2 C.F.R. § 200.202(a)(1). When the agency announces its NOFO, it must provide "[a] brief description that is written in plain language and summarizes the goals and objectives of the program," 2 C.F.R. § 200.204(a)(8), and must list the "agency's funding priorities or focus areas," 2 C.F.R. § 200, App. I (b)(3)(i)(B).

14. On January 27, 2022, DOT issued a NOFO, as required by 49 U.S.C. § 6702(d)(5), to announce the methodology by which it would evaluate applications for the RAISE Grant Program. The NOFO was amended on March 22, 2022, to reflect additional funding made available under the Consolidated Appropriations Act, 2022 (together with the funding

appropriated by the IIJA, "RAISE Funding").[1] *See* Pub. L. 117-103. After March 22, 2022, DOT did not amend or update the NOFO at any point.[2] A true and correct copy of the NOFO is attached hereto as Exhibit A. The NOFO stated that funds would be awarded on a "competitive basis for surface transportation infrastructure projects that will have a significant local or regional impact." Ex. A at 1.

15. The NOFO outlined the eight merit criteria that would determine which projects were selected, specifically evaluating applications based on the "statutory primary selection criteria: safety, environmental sustainability, quality of life, economic competitiveness and opportunity, state of good repair, and mobility and community connectivity. Statutory additional considerations include partnership and collaboration, innovation, demonstrated project readiness, and cost effectiveness." *Id*. at 7. These selection criteria were prescribed by Congress in the enacting statute. 49 U.S.C. §§ 6702(d)(3), (4).

16. In the "environmental sustainability" category, the highest scoring projects included those with "electrification or zero emission vehicle infrastructure," and projects receiving the highest score for "innovation" included those which deployed "technologies and other practices that drive safety, equity, climate and resilience." Ex. A at 44; 49.

17. The NOFO specifically listed **"***installation of electric vehicle charging stations*" as an example of a project that supports "environmental sustainability." *Id.* at 52 (emphasis added).

---

[1] The IIJA initially required that RAISE Funding be obligated by September 30, 2026, but in February 2026, Congress extended the applicable obligation deadline until September 30, 2031. *See* Consolidated Appropriations Act, 2026, Pub. L. No. 119-75 § 109, 140 Stat. 173, 331 (2026). The RAISE Funding appropriated by the Consolidated Appropriations Act, 2022, will remain "available until expended." Pub. L. No. 117-103, 136 Stat. 49, 685.

[2] *See* FY 2022 National Infrastructure Investments Grants Notice, last updated March 22, 2022. https://www.grants.gov/search-results-detail/337382 (accessed September 28, 2026).

18. Electric vehicle infrastructure was also a positive factor in the NOFO's innovation category. The NOFO stated that "[w]hen making RAISE grant award decisions, DOT will consider any innovative technological approaches proposed by the applicant, particularly projects that incorporate innovative technological design solutions, *enhance the environment for connected, electric, and automated vehicles,* or use technology to improve the detection, mitigation, and documentation of safety risks." Ex. A at 57 (emphasis added). The NOFO listed innovative technological approaches that DOT was interested in funding, including "*technologies and infrastructure that encourage electric vehicle charging." Id.* at 58 (emphasis added).

19. Furthermore, pursuant to the statutory requirement that a portion of grant funding go to "historically disadvantaged communit[ies]" and "areas of persistent poverty," 49 U.S.C. § 6702(f)(3), the NOFO designated certain census tracts as qualifying communities if they had a poverty rate of at least 20% over the prior 30 years. Ex. A at 17-18.

20. The NOFO also elaborated on the primary statutory criteria, explaining, for example, that DOT would prioritize "projects that address climate change, proactively address racial equity, and reduce barriers to opportunity." Ex. A at 5. The NOFO was structured "to award projects under the RAISE Program that address environmental justice, particularly for communities that disproportionally experience climate change-related consequences," and "to award projects under the RAISE Program that proactively address racial equity and barriers to opportunity, including automobile dependence as a form of barrier, or redress prior inequities and barriers to opportunity." *Id*. at 4-5.

*The City's RAISE Application*

21. The City applied for the FFY22 RAISE Grant Program on April 13, 2022, submitting a proposal for funding for the Roxbury Project. A true and correct copy of the City's application is attached hereto as Exhibit B (the "Application").

22. The Roxbury Project will improve three heavily-trafficked surface roadways in Boston by contributing to state of good repair, widening sidewalks, creating safer conditions for pedestrians and cyclists, and enabling faster bus service for commuters. *See* Ex. B at 2. The current street design is a legacy of Boston's urban renewal era in the 1960s, when neighborhood blocks were cleared through eminent domain. *Id.* Investment in these streets will quality of life and improve environmental sustainability for those living and working in this busy and vibrant urban area. *Id*. The three streets slated for infrastructure improvements are the primary roadways of the Roxbury neighborhood, a "Historically Disadvantaged Community" and "Area of Persistent Poverty" as defined by DOT. *See id.* at 15.

23. The City's application demonstrated that the Roxbury Project met all of the merit criteria outlined in the NOFO. *See* Ex. B at 18-28. The NOFO indicated that the environmental sustainability, safety, quality of life, and mobility and community connectivity merit criteria had greater priority in the selection process. *See* Ex. A at 7. Key elements establishing that the Roxbury Project application satisfied the statutory criteria included:

    a. **Safety (49 U.S.C. § 6702(d)(3)(A)):** The Roxbury Project is a safety priority for the City, as the streets identified for improvements are in the top 3% of Boston's streets in terms of concentration of traffic injuries and fatalities. *See* Ex. B at 1, 18-19.

b. **Quality of Life (49 U.S.C. § 6702(d)(3)(C))**: Improvements to these streets will support the small businesses, community centers, and recent immigrant communities that call them home, as well as improving Roxbury residents' ability to reliably travel to major employment centers and healthcare institutions. Ex. B at 20-21.

c. **Improved Mobility and Community Connectivity (49 U.S.C. § 6702(d)(3)(F))**: The Roxbury Project will incorporate wide sidewalks, dedicated bus lanes, and pedestrian signals at crossings. In the Roxbury neighborhood, 41% of residents use transit to commute to work. *See* Ex. B at 2. For bus passengers, Malcolm X Boulevard and Warren Street are currently two of the top ten "high delay" streets in the City. *Id.* at 1. The Roxbury Project will ease this travel burden while adding related improvements that integrate these major corridors with smaller community streets. Ex. B at 21-23.

d. **Economic Competitiveness and Opportunity (49 U.S.C. § 6702(d)(3)(D))**: Small businesses located on the Roxbury corridors will benefit from the improved pedestrian environment, and Roxbury residents will have better connections to both the City's major employment centers and educational, training, and workforce development opportunities. Ex. B at 23-24.

e. **State of Good Repair (49 U.S.C. § 6702(d)(3)(E))**: The Roxbury Project's targeted corridors require significant maintenance today, including resurfacing and curb ramp remediation to ensure compliance with the Americans with Disabilities Act. The Roxbury Project will address these concerns and decrease the need for future piecemeal maintenance. Ex. B at 25-26.

f. **Partnership and Collaboration (49 U.S.C. § 6702(d)(4)(A))**: The City will complete the Roxbury Project in partnership with the Massachusetts Bay Transit Authority ("MBTA") and the Massachusetts Department of Transportation ("MassDOT"). Boston is also committed to engaging community stakeholders in the neighborhood. Ex. B at 26-27.

g. **Innovation (49 U.S.C. § 6702(d)(4)(B))**: The Roxbury Project incorporates technologies including smart traffic signals, kiosks with bus arrival information, heat and air quality sensors, and EV charging stations. Ex. B. at 27-28.

24. Finally, the City met the NOFO's—and statute's—"environmental sustainability" merit criteria, which explicitly listed EV charging infrastructure as an example of a project which could receive the highest score. Ex. A at 44; *see also* 49 U.S.C. § 6702(d)(3)(B). The City's application made clear that the Roxbury Project would support environmental sustainability through EV charging infrastructure and otherwise. The Roxbury Project will:

a. Preserve and increase tree canopy on all three streets, reducing the effects of urban "hot spots" and providing natural air quality benefits. Ex. B at 5. As a result of urban renewal land clearance in the 1960s, these corridors lack the historic tree canopy of many other Boston neighborhoods, contributing to a heat island effect. *Id.* at 1. The areas surrounding the three streets are typically two to five degrees hotter than the median Boston temperature. *Id.* at 5.

b. Improve conditions for everyone traveling on these corridors, and expand infrastructure for people riding the bus, bicycling, and walking, promoting greener transportation choices and reducing air pollution from private vehicles. *Id.* at 19-

20. The plans being considered include improved pedestrian crossings, bus lanes on Warren Street and Malcolm X Boulevard, and bike lanes on all three streets. *Id.* at 6-9.

c. Mitigate the consequences of more severe weather events, including through additional stormwater management features to mitigate the increased risk of flooding. *Id.* at 5, 9.

d. Install public electric vehicle charging infrastructure, which supports both the reduction of greenhouse gas emissions and improvements in air quality. *Id.* Plans provide for all three corridors to include an EV charging station. *Id.* at 9.

25. The Roxbury Project also serves an Area of Persistent Poverty and a Historically Disadvantaged Community, as defined by DOT and prioritized by the statute authorizing the RAISE Grant Program. Ex. B at 15; 49 U.S.C. § 6702(f)(2). Boston's application confirmed this with DOT's own census data analysis tool, which has since been removed from DOT's website. Ex. B at 15.

26. Ultimately, DOT agreed that the Roxbury Project met the merit criteria outlined in the NOFO and awarded a RAISE grant to the City.

*Boston's Grant Award and Preparations for the Project*

27. DOT issued a Notice of Award for the Roxbury Project on August 30, 2022, for $20,000,000 of the total estimated project costs of $33,997,896 (the "Boston Grant Award"). DOT acknowledged "green infrastructure" as a feature of the Roxbury Project in its award letter. A true and correct copy of DOT's Notice of Award is attached hereto as Exhibit C.

28. The City of Boston has historically partnered with DOT to make important investments in City infrastructure projects, including, for example, recent improvements to connect historic sites along the Freedom Trail. DOT grants typically involve a lengthy iterative process between the time the grant is awarded and the ultimate signed agreement, and DOT has consistently engaged in this process as a good-faith partner with the City. Prior to 2025, DOT had never abruptly withdrawn an award from Boston. Based on prior experience with DOT and FTA, Boston took many steps with the expectation that the award would be finalized.

29. After the award, the City focused on building capacity to manage, design, and construct the Roxbury Project, as well as onboarding as an FTA grant recipient. The City also worked on integrating the Roxbury Project into its existing capital improvement plans for connected transportation corridors in the Roxbury neighborhood.

30. In 2024, Boston prepared for the Roxbury Project by conducting a months-long public procurement process to hire an engagement and planning firm to design the project. The procurement process included community members representing each of the three impacted streets. The City selected a vendor, but it ultimately did not execute a contract with the vendor because DOT withdrew the award.

31. Boston also continued to work with the MBTA on complementary projects which would support the Roxbury neighborhood and transit routes impacted by the Roxbury Project. These efforts included a plan to rehabilitate Blue Hill Avenue, a street which connects to Warren Street, as well as planned improvements to bus service in the neighborhood which will benefit from the Roxbury Project's planned addition of a bus lane to Malcolm X Boulevard. The City was also coordinating with the MBTA on projects to revitalize

adjacent Nubian Square and improve Tremont Street and Columbus Avenue, streets which run perpendicular to Melnea Cass Boulevard and Malcolm X Boulevard.

32. The City also solicited feedback from the community through surveys and stakeholder meetings, and launched a website to communicate with the public about the process.

33. In early 2024, Boston began the arduous onboarding process to receive FTA funds for the Roxbury Project. FTA's onboarding requires the recipient to demonstrate legal capacity, financial capacity, and civil rights compliance, among other requirements, prior to executing a grant agreement. The onboarding documents were to be submitted as one package only once fully completed. While Boston was preparing its onboarding materials, City employees worked with FTA staff to discuss drafts and prepare the necessary documents for submission. Among other coordination, City of Boston and FTA employees met weekly for eight months between March and November of 2024 to work through aspects of the submission.

34. The City worked through the following steps to onboard as an FTA grant recipient prior to DOT's withdrawal of the Boston Grant Award:

    a. To demonstrate financial capacity, the City had to complete a questionnaire, provide copies of the current year operating and capital budget, provide copies of two years of single audit reports, prepare a 3-5 year financial plan, and provide copies of the City's Financial Management Desk Procedures for several topic areas. Coordinating with DOT, the City prepared these materials and had them ready for submission.

    b. To demonstrate technical capacity, the City had to complete a questionnaire, provide supporting documentation, provide an organizational chart, and provide

information on procurement procedures. Coordinating with DOT, the City had prepared these materials and had them ready for submission.

c. To demonstrate civil rights compliance, the City had to document how it complies with federal anti-discrimination law. The City was in the process of developing FTA's required documents.

d. To demonstrate legal capacity, the City had to provide an Opinion of Counsel and an Authorizing Resolution. The City Council passed the Authorizing Resolution on November 5, 2024, and the City submitted the Authorizing Resolution to FTA on December 5, 2024. On January 14, 2025, FTA accepted the City's Authorizing Resolution. On December 17, 2024, the City submitted the Opinion of Counsel to FTA. FTA provided ministerial feedback on the City's Opinion of Counsel on January 14, 2025, and the City was in the process of negotiating a revised version with FTA.

e. According to the National Environmental Policy Act ("NEPA"), FTA grant awardees must also complete an environmental review of the project or qualify for an exemption from environmental review. *See* 42 U.S.C. § 4321 *et seq.* The Roxbury Project should have been exempt from environmental review, under FTA's Categorical Exclusion regulations, because the project will take place entirely within the existing operational right-of-way.[3] The City submitted the first set of materials requested by DOT to process the NEPA exemption on August 23, 2024. On August 26, 2024, FTA confirmed receipt of the City documents. FTA

[3] Projects taking place entirely within operational right-of-ways "based on FTA's past experience with similar actions, do not involve significant environmental impacts," and therefore qualify for Categorical Exclusion from NEPA review. *See* 23 C.F.R. § 771.118 (c)(12).

conveyed that they needed to provide feedback on the first set of materials prior to processing the second set of required materials. The City followed up several times to request an update on the NEPA review process. On August 18, 2025, FTA stated that the first set of NEPA documents were still under review and that FTA intended to have the review finalized by October 2025. FTA was still reviewing Boston's submitted documentation when the Boston Grant Award was withdrawn.

35. The City took additional steps to coordinate with regional planning authorities and prepare for the Roxbury Project. Under federal law, expenditures of federal funds for transportation planning and capital projects in a city of Boston's size must first be approved by the regional Metropolitan Planning Organization ("MPO"). *See* 49 U.S.C. § 5303(j). In 2024, Boston requested that the MPO vote to program the Roxbury Project in its Transportation Improvement Program ("TIP"). On December 19, 2024, the MPO endorsed Amendment 4 to the MPO's FFY 2025-2029 TIP. This action programmed the Roxbury Project in the MPO's then-current TIP, an essential step to allow the City to accept the funds.

36. The City included funding in the City's Fiscal Year ("CFY") 2025 and 2026 capital budgets to meet the local match requirement of the Boston Grant Award, such that capital funding would be available to meet the additional costs of the Roxbury Project not covered by the $20 million dollar grant. The City Streets Cabinet included the Roxbury Project in its CFY 2025 and 2026 five-year capital plans.

37. City employees within the Boston Transportation Department spent hundreds of hours working on preparations for the grant. City employees in the Environment Department,

Public Works Department, Law Department, and the Office of Budget Management also invested significant time in preparing for the grant.

*DOT Withdrawal of the Boston Grant Award*

38. On September 9, 2025, Maria Lefevre, Executive Director of the Office of DOT's Under Secretary for Policy, sent the City a brief letter (the "DOT Letter") stating that DOT was now "withdrawing selection" of the Boston Grant Award, effective immediately. A true and correct copy of the DOT Letter is attached hereto as Exhibit D.

39. Boston had been working with DOT and FTA employees on preparations for the Boston Grant Award. Those federal employees included Peter Butler, Brandon Burns, Michelle Muhlanger, Eric Papetti, Charles Dyer, Margaret Griffin, Jonathan Schmidt, and Kirstie Tirandazi. Boston had not previously worked with, or heard from, Maria Lefevre.

40. The DOT Letter first defined DOT's priorities as "presently includ[ing]: promoting traditional forms of energy and natural resources to the greatest extent possible; and ensuring that taxpayer dollars are used efficiently in ways that maximally benefit the American people and improve their quality of life." *See* Ex. D. DOT's statement of "priorities" made no reference to the statutory criteria for RAISE grants, the NOFO, or the prior DOT policies on which the City relied.

41. DOT then provided a single reason for the withdrawal of Boston Grant Award: "the Department has determined that your grant is inconsistent with the priorities listed above because of the project's inclusion of EV charging infrastructure. **Specifically, your project proposes to install EV charging stations.**" *Id*. (emphasis added). Again, the DOT Letter made no reference to the statutory criteria for RAISE grants, the NOFO, or the prior DOT policies on which the City relied. It made no acknowledgment that EV

charging constituted less than 1% of the proposal and was an element that Boston was encouraged to include in order to receive a top score from DOT

42. Without further explanation or consideration, the DOT Letter claimed that DOT had "individually reviewed" the Boston Grant Award and concluded that, "[b]ecause your project no longer aligns with DOT priorities, the Department is withdrawing the selection of your project for a FY 2022 RAISE grant." *Id.*

43. Until the City received the DOT Letter, the City had no notice whatsoever that the Boston Grant Award might be withdrawn. From the time of the award through 2025, while working closely with the City, neither DOT nor FTA ever raised this prospect. Indeed, environmental sustainability and technological innovation were criteria prioritized by Congress, and EV charging infrastructure was explicitly prioritized in the NOFO's merit criteria as a feature that would boost the project's score in those categories.

44. The DOT Letter did not provide any details of the "individual[ized] review[]" DOT claimed it had conducted, did not cite the IIJA or the criteria set forth in 49 U.S.C. § 6702(d)(3), and did not address the merit criteria listed in the NOFO. *See* Ex. D. The DOT Letter did not offer the City any opportunity to respond to DOT's new determination, nor any remedy or process to appeal DOT's summary withdrawal. *Id.*

45. On the same day that Boston received the DOT Letter, DOT sent out remarkably similar letters withdrawing RAISE Grant Program awards to other entities across the country. These letters were sent to RAISE awardees including Albuquerque, New Mexico, and the Central Naugatuck Planning Association in Connecticut.[4] A true and correct copy of the letter from Maria Lefevre to Albuquerque is attached hereto as Exhibit E.

---

[4] *See City of Albuquerque v. Duffy*, Case No. 1:25-cv-01072, Dkt. 1, Ex. D (D.N.M. Oct. 31, 2025); Josie Reich, *Trump Cuts $5.7M Bike Trail Grant for Naugatuck River Greenway Trail*, Conn.

*Boston's Response to DOT's Withdrawal*

46. Because of the importance of these funds and the years of effort Boston invested in preparation for the Roxbury Project, the City approached DOT after the withdrawal in the hopes of preserving the Boston Grant Award. On October 8, 2025, Boston offered to remove the EV charging stations from the project plan in order to mitigate the purported conflict with DOT's "priorities." A true and correct copy of the letter from Jascha Franklin-Hodge is attached hereto as Exhibit F. The City informed DOT that the EV charging stations were a vanishingly small aspect of the overall Roxbury Project, estimated to cost a fraction of 1% of the Boston Grant Award. *Id.*

47. Having received no response, on December 19, 2025, the City sent a follow-up email to DOT, again seeking a resolution. A true and correct copy of the email from Jascha Franklin-Hodge is attached hereto as Exhibit G.

48. The City followed up again on January 8, 2026. FTA Regional Administrator Peter Butler responded, "There is no change to the status of the Roxbury Resilient Corridor project. As stated in the September 9, 2025, letter to Vineet Gupta, the project remains cancelled." A true and correct copy of the email exchange between Boston Transportation Planner Maria Castillo and Peter Butler is attached hereto as Exhibit H.

49. This response remains the only communication the City has received from DOT or FTA about the Boston Grant Award since the DOT Letter. Despite the City's efforts, DOT never substantively responded to the City's proposal.

50. The City removed the additional funding reserved for the Roxbury Project from the CFY 2027 capital budget because of DOT's arbitrary withdrawal of the grant. Without access

Mirror (Sept. 29, 2025), https://ctmirror.org/2025/09/29/naugatuck-river-greenway-trail-trump-funding-revoked/.

to the Boston Grant Award, the City was forced to suspend the Roxbury Project and temporarily remove the reserved local matching funds from the City Streets Cabinet's five-year CFY 2027 capital plan pending the resolution of this funding dispute.

*The Administration's Efforts to Freeze IIJA Funds*

51. DOT's withdrawal of the Boston Grant Award did not occur in a vacuum. On January 20, 2025, the President issued an Executive Order titled "Unleashing American Energy." The Executive Order included plans to "terminat[e] the Green New Deal," and instructed federal agencies to "consider[] the elimination of unfair subsidies and other ill-conceived government-imposed market distortions that favor EVs over other technologies." Exec. Order No. 14,154, 90 Fed. Reg. 8,367 (Jan. 29, 2025). The next day, the federal Office of Management and Budget ("OMB") issued a memorandum which stated that "the Executive Order entitled Unleashing American Energy requires agencies to immediately pause disbursement of funds appropriated under the Inflation Reduction Act of 2022 (Public Law 117-169) or the Infrastructure Investment and Jobs Act (Public Law 117-58)." *See* OMB M-25-11 (the "OMB Memo").

52. The OMB Memo instructed federal agencies to freeze IIJA funds that would support EV projects and other environmental sustainability priorities established by Congress. At DOT, Secretary Duffy issued a plan for the agency to withdraw funding which supported these goals.

53. On or about March 11, 2025, Secretary Duffy issued an internal directive addressed to the "Heads of Secretarial Offices and Operating Administrations" (the "Duffy Memo"). A true and correct copy of the Duffy Memo is attached hereto as Exhibit I. The Duffy Memo instructed offices to review "competitive award selections made after January 20, 2021,

that do NOT have fully obligated grant agreements or cooperative agreements in place." Ex. I at 1 (emphasis in original). The Duffy Memo stated that "[a]ll competitive grant and cooperative agreement award selections must comply with current Administration priorities and Executive Orders," and specifically referenced the President's "Unleashing American Energy" Executive Order. The Duffy Memo's stated goal was to "eliminate flagged activities" from the awards being reviewed. *Id.* at 3.

54. Activities to be "flagged" by the review included "allocating funding to advance climate, equity, and other priorities counter to the Administration's Executive Orders," including awards for projects containing "any of the following elements: equity activities, Diversity, Equity, and Inclusion (DEI) activities, climate change activities, environmental justice (EJ) activities, gender-specific activities, when the primary purpose is bicycle infrastructure (i.e., recreational trails and shared-use paths, etc.), electric vehicles (EV), and EV charging infrastructure." *Id*. at 1-2.

55. The Duffy Memo further required "project-by-project" review of any "project scope elements for potential removal" if the project met the following criteria:

   a. "***[s]tatutory language*** includes equity requirements, climate considerations, or bicycle infrastructure;

   b. ***NOFO mandatory evaluation criteria*** includes equity and/or climate requirements;

   c. [or] [e]ligible activities included bicycle infrastructure, **EV and/or EV charging infrastructure**."

*Id*. (emphasis added).

56. The Duffy Memo, therefore, explicitly targeted grant programs in which funds were appropriated by Congress for particular purposes in order to systematically prevent those

funds from being used for those purposes. It directed DOT staff to identify congressional intent specifically for the purpose of DOT defying that intent.

57. Following this alleged "project-by-project review," the Duffy Memo instructed DOT and FTA leadership to decide if projects could: "a. Continue in their current form with no change; b. Be revised with a reduced or modified scope; or c. Be canceled entirely." *Id*. at 2-3.

58. The Duffy Memo instructed DOT and FTA leadership to negotiate with grant awardees regarding disfavored elements of their projects. The Duffy Memo indicated that DOT and FTA staff "should negotiate with project sponsors to update project scopes to eliminate and, where possible, replace those identified elements [including EV charging infrastructure]." *Id.* at 3. According to the process laid out by the Duffy Memo, if the project sponsor agreed to DOT's suggested changes, DOT and FTA staff should "proceed to grant agreement formulation and execution," and if the project sponsor did not agree to changes, DOT and FTA staff should reduce the grant award accordingly. *Id.*

59. On April 15, 2025, the District Court for the District of Rhode Island enjoined the federal funding freeze implemented by the OMB Memo, and further ordered OMB to provide written notice to federal agencies that the "unilateral, non-individualized directives" in the OMB Memo should not be implemented "with respect to the disbursement of all open awards under the Inflation Reduction Act or the Infrastructure Investment and Jobs Act." *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric*., 778 F. Supp. 3d 440, 479 (D.R.I. 2025), *aff'd in part, vacated in part on other grounds*, No. 25-1428, 2026 WL 2279789 (1st Cir. Aug. 7, 2026).

60. Upon information and belief, DOT would have received notice from OMB that the OMB Memo's directive to make unilateral, non-individualized decisions to withdraw awards under the IIJA had been enjoined by court order.

*The City Relied on the Boston Grant Award to Fund the Roxbury Project*

61. Defendants' withdrawal of the Boston Grant Award harmed the City by eliminating approximately 60% of the necessary funding for the Roxbury Project—funding that the City had been counting on receiving for three years to support critical infrastructure, improve environmental sustainability, play a key role in the City's broader design plan for the Roxbury neighborhood, improve transit times for bus riders, and enhance pedestrian and cyclist safety.

62. The Roxbury Project is critical to the City's plans to create safe routes through the Roxbury neighborhood. The City and the MBTA are investing in safety improvements to streets surrounding the three Roxbury Project corridors as part of a broader neighborhood plan, which includes upgrades to Tremont Street, Columbus Avenue, Blue Hill Avenue, and Nubian Square. The City and the MBTA are working diligently to make this vision for Roxbury a reality—today, construction is underway to repair intersections in between Malcolm X Boulevard and Massachusetts Avenue.

63. Over the many months of collaboration with FTA, during which FTA gave no indications that the Boston Grant Award was not proceeding, the City came to rely on this funding source and expended considerable resources taking the steps necessary to execute the Project as an FTA grant recipient.

64. Moreover, the City had an interest in being properly considered for RAISE funds, under lawful criteria established in the IIJA and NOFO. That is, the City had an interest in a fair

opportunity for the Roxbury Project to compete on a level playing field for available RAISE funds, without being undercut by new and conflicting DOT "priorities."

65. Defendants' abrupt and opaque withdrawal of the Boston Grant Award concluded the agency's decision-making process and has direct and appreciable legal consequences, constituting a final agency action.

66. In withdrawing the City's award, Defendants acted arbitrarily, capriciously, and contrary to law, including by purporting to turn the congressional authorization for the RAISE Grant Program on its head by defunding projects precisely *because* they meet the criteria provided by statute and the NOFO.

67. Defendants exceeded their statutory authority when they withdrew the Boston Grant Award based on revised eligibility standards for the RAISE Grant Program which directly contravened the merit criteria published in the NOFO according to the authorizing statute. 49 U.S.C. § 6702(d)(5).

68. Defendants' decision to withdraw the Boston Grant Award due to arbitrary new agency priorities imposed upon the RAISE Grant Program without notice was contrary to the intent of Congress, which directed the Secretary to fund projects that improve environmental sustainability, consider innovative technologies, and support projects in historically disadvantaged communities or areas of persistent poverty while making the awards. 49 U.S.C. § 6702.

69. An actual controversy exists in this matter; Defendants' withdrawal of the Boston Grant Award was unlawful and should be set aside.

## CAUSES OF ACTION

## COUNT I – Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A)

### Arbitrary and Capricious

### *Against All Defendants*

70. The City realleges all paragraphs above as if fully set forth herein.

71. Defendants DOT and FTA are "agencies" as defined in 5 U.S.C. § 701(b)(1).

72. "Final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704.

73. An agency action is final if it: (1) "marks the consummation of the agency's decisionmaking process"; and (2) is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 808 (2024) (citation modified).

74. Defendants' withdrawal of the Boston Grant Award constitutes a final agency action because it represents the "consummation" of the agency's decision-making process and is an action "from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citation and quotation marks omitted); *see also Woonasquatucket River Watershed Council v. U.S. Dep't Agric.*, --- F.4th ----, 2026 WL 2279789, at *10-11 (1st Cir. Aug. 7, 2026) (Affirming the District of Rhode Island's finding that agency withdrawal of already-awarded grants was likely a final agency action, reviewable under § 704 of the APA); *Washington v. Fed. Emerg. Mgmt. Agency*, 818 F. Supp. 3d 195, 203-04 (D. Mass. 2025) (Finding that FEMA had made a final determination by ending a grant program).

75. A reviewing court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

76. Defendants' withdrawal of the Boston Grant Award was arbitrary and capricious in violation of the APA.

77. Government agencies and officers act in an arbitrary and capricious manner if they fail to engage in "reasoned decision-making." *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (citation omitted). The "well-worn arbitrary-and-capricious standard ensures that an administrative agency 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *FDA v. Wages & White Lion Invs.*, 604 U.S. 542, 567 (2025) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

78. Agency action is arbitrary and capricious when the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43.

79. "In assessing whether an agency action is arbitrary and capricious, a court may consider only 'the grounds that the agency invoked when it took the action.'" *Woonasquatucket River Watershed Council*, 2026 WL 2279789, at *13 (citation omitted).

80. When changing positions, an agency is not writing on a "blank slate." The agency is "required to assess whether there were reliance interests, determine whether they were

significant, and weigh any such interests against competing policy concerns." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 33 (2020).

81. The agency's explanation for its action "must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account, because [the agency] acts arbitrarily and capriciously by ignor[ing] such matters." *New York v. Trump*, 171 F.4th 1, 20–21 (1st Cir. 2026) (quotations and citations omitted); *see also FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Disclaimers about the substantive rights conferred by an agency action are relevant in considering the strength of any reliance interests, but "reasoned agency action still requires 'that consideration be undertaken by the agency in the first instance.'" *Woonasquatucket River Watershed Council,* 2026 WL 2279789, at *13 (citation omitted).

82. The regulations governing NOFOs, *see* 2 CFR §§ 200.202-204, "prioritize ensuring that grantees are on notice, before applying, as to what the program goals and agency priorities are for any particular award," and are not consistent with permitting agencies to disregard or "change goals and priorities at any time." *New Jersey v. United States Off. of Mgmt. & Budget*, No. 1:25-CV-11816-IT, 2026 WL 2069832, at *14 (D. Mass. July 17, 2026); *see also Illinois v. Noem*, 813 F. Supp. 3d 282, 305 (D.R.I. 2025) ("Whether the . . . NOFO conferred any legally enforceable rights on Plaintiffs is not at issue . . . The fact that Defendants deviated from an informal decision (i.e., the NOFO) does not absolve Defendants of their responsibility to provide some semblance of adequate reasoning for that change.").

83. Defendants' withdrawal of the Boston Grant Award was arbitrary and capricious for many reasons, including, but not limited to, the following:

a. Defendants failed to reference any of the criteria set forth in the grant program's authorizing statute, 49 U.S.C. § 6702, or explain how the withdrawal was consistent with those criteria.

b. Defendants failed to reference any of the criteria set forth in the NOFO or explain how the withdrawal was consistent with those criteria.

c. Defendants failed to explain their departure from the goals and objectives described in the NOFO. Defendants failed to explain the agency's change in position regarding EV infrastructure, which had been prioritized in the NOFO.

d. Defendants failed to consider the de minimis impact of the supposedly offending infrastructure in the Roxbury Project.

e. Defendants failed to consider or provide any alternative solution to withdrawal of the award, even where alternatives existed that would have accomplished their stated concerns.

f. Defendants failed to follow the instructions of the Duffy Memo and consider or provide a modified award, instead resorting immediately to complete withdrawal.

g. Defendants failed to respond to the City's proposal to modify the award or explain why such a modification would not resolve their objections to the Roxbury Project.

h. Defendants failed to consider any of the serious reliance interests engendered by the prior approval of the Boston Grant Award, including the time and resources spent to plan the project in conjunction with other work in the neighborhood, the administrative work done to onboard as an FTA recipient, the collaboration with state and regional partners, and the community engagement done to prepare for the Roxbury Project.

i. Defendants did not offer the City an opportunity to participate in or respond to its decision-making, or provide appeal rights or any other remedy.

84. The "general and highly similar nature of the [withdrawal] letters" sent to RAISE grant awardees on September 9, 2025, further demonstrates that DOT "did *not* engage in . . . a reasoned process." *Urban Sustainability Directors Network v. United States Dep't of Agric*., No. 25-1775 (BAH), 2025 WL 2374528, at *36 (D.D.C. Aug. 14, 2025) (Finding federal grant terminations sent by USDA and its component agencies were likely arbitrary and capricious) (emphasis in original), *appeal held in abeyance,* No. 25-5370 (D.C. Cir. Dec. 5, 2025). *See* Ex. D; Ex. E.

85. Accordingly, Defendants' actions to withdraw the Boston Grant Award must be set aside as arbitrary, capricious, and not in accordance with law.

86. The City is an aggrieved person suffering a legal wrong or adversely affected by Defendants' conduct under 5 U.S.C. § 702 and is entitled to declaratory and injunctive relief pursuant to 28 U.S.C. § 2201.

**COUNT II – Violation of Administrative Procedure Act, 5 U.S.C. § 706 (2)(A); § 706 (2)(C)**

**In Excess of Statutory Authority and Contrary to Law**

***Against All Defendants***

87. The City realleges all paragraphs above as if fully set forth herein.

88. The APA authorizes this Court to hold unlawful and set aside final agency action that is "contrary to constitutional right, power, privilege, or immunity," "in excess of statutory jurisdiction, authority, or limitations," or "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §§ 706(2)(A), (C).

89. "It is no exaggeration to say that 'an agency literally has no power to act . . . unless and until Congress confers power upon it.'" *City of Providence v. Barr,* 954 F.3d 23, 31 (1st Cir. 2020) (citation omitted). "Any action that an agency takes outside the bounds of its statutory authority is ultra vires and violates the [APA]." *Id.* (citations omitted).

90. Agency grant programs are governed by their authorizing statutes, and the operation of these programs is not committed to agency discretion by law. *Climate United Fund v. Citibank, N.A.*, 778 F. Supp. 3d 90, 112 (D.D.C. 2025) ("Congress appropriated money for specific grant programs by a specific deadline and set specific, substantive priorities, thereby limiting how the appropriated funds could be allocated."); *see also City of Albuquerque v. Duffy*, No. 1:25-cv-01072, Dkt. 38 at *10 (D.N.M. July 31, 2026).

91. The IIJA required that DOT evaluate applications for the RAISE Grant Program "through a methodology that is discernible and transparent to the public." 49 U.S.C. § 6702(d)(5)(A). The IIJA required that the methodology "be published by the Secretary as part of the notice of funding opportunity under the program." § 6702(d)(5)(B).

92. Neither the IIJA nor any other federal statute or regulation authorizes Defendants to withdraw an FFY22 RAISE award based on the inclusion of EV infrastructure. To the contrary, Congress and DOT expressly indicated that measures including EV charging infrastructure were considered an asset in RAISE Grant Program proposals. Defendants' authority over the awards stems from the underlying statutory criteria that established the grant program—criteria which prioritized projects that would improve environmental sustainability and adopt innovative technologies. 49 U.S.C. §§ 6702(d)(3)(B), (4)(B). The NOFO's merit criteria awarded points for inclusion of EV infrastructure. Ex. A at 43-49.

93. "Agencies may not choose to reject, terminate, or otherwise penalize grant applications based on the very criteria Congress expressly required the agency to promote." *California v. U.S. Dep't of Educ.*, No. 1:25-cv-10548-AK, Dkt. 176 at *59 (D. Mass. Sept. 17, 2026) (Finding that the Department of Education's efforts to cancel grant programs could not be reconciled with the statutory mandates for those programs). An agency has no statutory authority to act "where the statute's text clearly points the reader elsewhere." *Ass'n of Am. Universities v. Dep't of Def.*, 806 F. Supp. 3d 79, 107 (D. Mass. 2025) (Finding that agency could not use criteria contrary to statute); *see also Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 778 F. Supp. 3d 440, 473 (D.R.I. 2025) (Finding that agencies likely exceeded their statutory authority in freezing all IIJA funds), *aff'd in part, vacated in part on other grounds*, No. 25-1428, 2026 WL 2279789 (1st Cir. Aug. 7, 2026); *see also Washington v. Fed. Emerg. Mgmt. Agency*, 818 F. Supp. 3d 195, 207 (D. Mass. 2025) (Finding agency action to shut down grant program unlawful, and noting that "this is a case about *unlawful Executive encroachment on the prerogative of Congress to appropriate funds for a specific and compelling purpose*, and no more than that.") (emphasis added).

94. Defendants have violated their governing statutes by withdrawing a grant already awarded under the specific statutory requirements set by Congress; in fact, Defendants withdrew the grant precisely because it satisfied the criteria set forth in 49 U.S.C. § 6702. An agency may not "decline to follow a statutory mandate or prohibition simply because of policy objections." *In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013) (Kavanaugh, J.); *see also Green & Healthy Homes Initiative, Inc. v. EPA*, 788 F. Supp. 3d 676, 699–700 (D. Md. 2025) (Finding that EPA violated the APA by terminating grants using criteria

directly contrary to the authorizing statute, and noting that "[t]he violation of statutory authority is especially clear here, because the stated basis for terminating these grants is entirely incompatible with the statutory mandate.").

95. Defendants further violated the IIJA by failing to make awards through a "discernible and transparent" methodology and by failing to make awards consistent with a methodology as published in a NOFO. 49 U.S.C. §§ 6702(d)(5)(A), (B). The DOT Letter cited priorities which were not included in the FFY22 NOFO published by DOT. *See* Ex. A; Ex. D. The methodology by which Defendants withdrew the Boston Grant Award was not discernable from the brief explanation provided in the DOT Letter, was not transparent to the public, and was not published in the NOFO as the statute required.

96. The City is an aggrieved person suffering a legal wrong or adversely affected by Defendants' conduct under 5 U.S.C. § 702 and is entitled to declaratory and injunctive relief pursuant to 28 U.S.C. § 2201.

## <u>COUNT III – Violation of Separation of Powers</u>

***Against All Defendants***

97. The City realleges all paragraphs above as if fully set forth herein.

98. Article I, Section 1 of the U.S. Constitution states: "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives." U.S. Const. Art. I, § 1. The legislative power "belongs to the legislative branch, and to no other." *FCC v. Consumers' Rsch.*, 606 U.S. 656, 672 (2025). "The Framers viewed the legislative power as a special threat to individual liberty, so they divided that power to ensure that 'differences of opinion' and the 'jarrings of parties' would 'promote deliberation and circumspection' and 'check excesses in the majority.'"

*Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 223 (2020) (quoting Federalist No. 70, at 475 (A. Hamilton)). The Constitution refutes the idea that the Executive can act as a lawmaker. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635-39 (1952) (Jackson, J., concurring).

99. "Under Article II of the Constitution and relevant Supreme Court precedents, the President must follow statutory mandates so long as there is appropriated money available and the President has no constitutional objection to the statute." *In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013) (Kavanaugh, J.) (Granting writ of mandamus where federal agency failed to "comply with the law as it has been set by Congress.").

100. Only Congress has the Constitutional right to appropriate funds. U.S. Const. Art. I, § 9, cl. 7. An executive agency "literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).

101. The President or his Executive Agencies have no constitutional power to withdraw funds appropriated by Congress. *New York v. McMahon*, 784 F. Supp. 3d 311, 351 (D. Mass. 2025), *appeal dismissed,* No. 25-1495, 2025 WL 3451815 (1st Cir. Sept. 15, 2025) (Finding that Defendants, in attempting to shut down the Department of Education, "violate[d] the separation of powers by violating the executive's duties . . . to expend funds that Congress has authorized it to appropriate.").

102. "[W]henever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge." *Collins v. Yellen*, 594 U.S. 220, 245 (2021).

103. Congress enacted the IIJA, which includes the Local and Regional Project Assistance Program, to award grants for "capital investments in surface transportation infrastructure." 49 U.S.C. § 6702(b)(1). Congress instructed DOT to consider funding projects that

improve environmental sustainability and adopt innovative technologies. 49 U.S.C. §§ 6702(d)(3)(B), (4)(B).

104. Defendants stated that they decided to withdraw the Boston Grant Award because the Roxbury Project "no longer aligns with DOT priorities," specifically because less than 1% of the grant dollars were intended for EV chargers, a feature encouraged by the FFY22 NOFO's merit criteria pursuant to 49 U.S.C. § 6702(d)(3)(B) ("improves environmental sustainability") and § (4)(B) ("adopts innovative technologies").

105. In other words, Defendants withdrew the Boston Grant Award because the City's Roxbury Project satisfied the criteria set forth in 49 U.S.C. § 6702.

106. Defendants' actions violate the separation of powers doctrine because the basis for withdrawing the funding award directly contravenes the statutory mandates establishing the RAISE Grant Program. In attempting to withhold funding based on the Executive's own policy priorities, Defendants not only claim "Congress's exclusive spending power," they have "also attempted to co-opt Congress's power to legislate." *See City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1234 (9th Cir. 2018).

107. The City is an aggrieved person suffering a legal wrong as a result of Defendants' conduct and is entitled to have these actions be set aside through declaratory and injunctive relief pursuant to 28 U.S.C. § 2201.

**COUNT IV – Violation of the Take Care Clause**

***Against All Defendants***

108. The City realleges all paragraphs above as if fully set forth herein.

109. The Constitution provides that the Executive Branch must "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3; *see Util. Air Reg. Grp. v. EPA*, 573 U.S. 302,

327 (2014) ("Under our system of government, Congress makes laws and the President . . . faithfully executes them." (quotation modified)).

110. The Constitution does not authorize the President "to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998).

111. "[T]he President's duty to enforce the laws necessarily extends to appropriations." *See City & Cnty. of San Francisco,* 897 F.3d at 1233–34.

112. The Executive Branch violates the Take Care Clause when it declines to execute a statute, overrides a statute, or overrides the legislative intent of Congress. *See In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999) ("[T]he President is without authority to set aside congressional legislation by executive order"); *Kendall v. United States*, 37 U.S. 524, 613 (1838) (rejecting the argument that by charging the President with the faithful execution of laws, the Take Care Clause "implies a power to forbid their execution"); *see also Util. Air Reg. Grp.*, 573 U.S. at 327 (noting that the President "act[s] at time through agencies").

113. Defendants violated the Take Care Clause by withdrawing the Boston Grant Award because its Roxbury Project both satisfied and was awarded pursuant to congressional legislation as set forth in 49 U.S.C. § 6702.

114. Defendants' actions overrode Congress's considered judgments.

115. The City is an aggrieved person suffering a legal wrong as a result of Defendants' conduct and is entitled to have these actions be set aside through declaratory and injunctive relief pursuant to 28 U.S.C. § 2201.

**COUNT V – Ultra Vires Agency Action**

***Against All Defendants***

116. The City realleges all paragraphs above as if fully set forth herein.

117. An executive agency may exercise only that authority which is conferred by statute. *See City of Arlington v. FCC*, 569 U.S. 290, 297 (2013) (Holding that federal agencies' "power to act and how they are to act is authoritatively prescribed by Congress, so that when they act improperly, no less than when they act beyond their jurisdiction, what they do is ultra vires").

118. Congress never directed Defendants to withdraw grants appropriately awarded pursuant to 49 U.S.C. § 6702.

119. When an agency or government officer's "powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions. The officer is not doing the business which the sovereign has empowered him to do or he is doing it in a way which the sovereign has forbidden. His actions are ultra vires his authority and therefore may be made the object of specific relief." *New York v. McMahon*, 784 F. Supp. 3d 311, 352 (D. Mass. 2025), *appeal dismissed*, No. 25-1495, 2025 WL 3451815 (1st Cir. Sept. 15, 2025) (quoting *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949)).

120. Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015). In other words, the U.S. Supreme Court has permitted equitable relief against federal officials who act "beyond th[e] limitations" required by federal statute. *Larson*, 337 U.S. at 689.

121. Defendants are acting ultra vires by withdrawing a grant already awarded under the specific statutory requirements set by Congress in 49 U.S.C. § 6702. *See Larson*, 337 U.S. at 689–91.

122. Defendants have no statutory authority to withdraw the Boston Grant Award for reasons wholly inconsistent with 49 U.S.C. § 6702.

123. Thus, Defendants' actions to withdraw the Boston Grant Award are unlawful ultra vires agency actions.

124. The City is an aggrieved person suffering a legal wrong as a result of Defendants' conduct and is entitled to have these actions be set aside through declaratory and injunctive relief pursuant to 28 U.S.C. § 2201.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court:

a. Declare Defendants' actions to withdraw the Boston Grant Award unlawful.

b. Vacate and set aside Defendants' actions to withdraw the Boston Grant Award pursuant to 5 U.S.C. § 706(2).

c. Enjoin Defendants from implementing, or effectuating through any action, the prior decision to withdraw the Boston Grant Award in contravention of the express congressional mandates in the IIJA and the merit criteria published in the FFY22 RAISE NOFO.

d. Pursuant to 5 U.S.C. § 705 and the Court's equitable authority, preserve and hold in abeyance $20 million in RAISE Funding in order to preserve the status quo and ensure the funds remain available pending disposition of this litigation.

e. Pursuant to 5 U.S.C. § 705 and the Court's equitable authority, enjoin Defendants from reallocating these funds or otherwise causing them to be unavailable should the City prevail in this litigation.

f. To the extent such dates remain applicable given subsequent congressional action, toll the obligation and expenditure dates listed in the NOFO and the City's award letter, to ensure that the City has a full and fair opportunity to receive and expend FFY22 RAISE Grant Program funding for which it qualifies, as intended by Congress. *See* Consolidated Appropriations Act, 2026, Pub. L. No. 119-75 § 109, 140 Stat. 173, 331 (2026); *see also* Ex. C.

g. Retain jurisdiction to ensure compliance with the orders of this Court.

h. Award Plaintiff its reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412.

i. Grant other such relief as this Court may deem proper.

Dated: September 28, 2026

Respectfully submitted,

**CITY OF BOSTON**
MICHAEL FIRESTONE
CORPORATION COUNSEL

*/s/Megan Corrigan*
Megan Corrigan (BBO No. 710869)
Assistant Corporation Counsel
Samuel B. Dinning (BBO No. 704304)
Senior Assistant Corporation Counsel
Thomas J. Broom (BBO No. 703136)
Senior Assistant Corporation Counsel

Christina Constas (BBO No. 715023)
Assistant Corporation Counsel
City of Boston Law Department
One City Hall Plaza, Room 615
Boston, MA 02201
(617) 635-4034
megan.corrigan@boston.gov
samuel.dinning@boston.gov
thomas.broom@boston.gov
christina.constas@boston.gov

*/s/Cassandra Crawford*
Cassandra Crawford (BBO No. 673532)*
Toby R. Merrill (BBO No. 601071)**
Graham Provost (*pro hac vice* forthcoming)†
PUBLIC RIGHTS PROJECT
490 43rd Street, Unit #115
Oakland, CA 94609
Tel: (510) 738-6788
cassandra.crawford@publicrightsproject.org
toby.merrill@publicrightsproject.org
graham.provost@publicrightsproject.org

*Attorneys for Plaintiff, City of Boston, MA.*

**Licensed in North Carolina. Not licensed to practice law in California.*
***Licensed in Massachusetts and New York. Not licensed to practice law in California.*
†*Licensed in Washington, D.C. Not licensed to practice law in California.*